**FOR PUBLICATION**

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 25-12041
_____

GREGORY LIGHT,

*Plaintiff-Appellant,*

*versus*

LVNV FUNDING, LLC
and ANDREU PALMA LAVIN & SOLIS, PLLC,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:24-cv-61655-AHS
_____

Before ROSENBAUM, LAGOA, and MARCUS, Circuit Judges.

LAGOA, Circuit Judge:

The Fair Debt Collection Practices Act authorizes suits by "any person" harmed by a debt collector's prohibited conduct. 15 U.S.C. §§ 1692d, 1692k(a). Ordinarily, the "person" who chooses to file suit is the consumer whose debt is being collected. Appellant Gregory Light, a Florida attorney, urges us to hold that the "person" can also be him, suing in his own name for the embarrassment, distress, and lost time he experienced while representing a client in a debt-collection action that did not go smoothly.

After careful review and with the benefit of oral argument, we dismiss this appeal for lack of jurisdiction because Light has not alleged a concrete injury in fact sufficient to establish Article III standing.

## I.     BACKGROUND[1]

Light is a Florida attorney who regularly represents individuals in consumer-debt matters. Appellee LVNV Funding LLC ("LVNV") is a debt-collection company, and Appellee Andreu Palma Lavin & Solis, PLLC ("APLS") is the law firm LVNV retained to collect an alleged debt from Franklyn Rodriguez. In April 2023, LVNV, through APLS, sued Rodriguez in Broward County, Florida Court. The case was assigned to the small-claims division.

---

[1] We draw the following facts from Light's First Amended Complaint and the documents attached to it. We accept as true the facts as set forth in the First Amended Complaint and draw all reasonable inferences in Light's favor. *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010).

On August 22, 2023, the day before a scheduled pretrial conference, Rodriguez retained Light to represent him. Light then contacted APLS to try to resolve the case before the pretrial conference. According to the First Amended Complaint, the parties reached an agreement in principle to resolve the case, and APLS represented to Light that it would inform the county court of the settlement at the next day's pretrial conference. Based on that representation, Light did not attend the pretrial conference.

On August 23, 2023, the county court entered a default against Rodriguez for failing to appear at the pretrial conference. The court also required LVNV to submit a proposed settlement or judgment package within thirty days of the default order or face dismissal. Light alleges that, after receiving the order, he contacted APLS to ask what had happened. APLS responded that its coverage counsel had been instructed "to continue pending settlement," but that "doesn't always happen," and said it would "make sure" the default was set aside. Relying on that representation, Light did not move to set aside the default.

On September 5, 2023, Rodriguez executed the settlement agreement and Light sent it to APLS. The next day, LVNV and APLS filed a motion for entry of default final judgment. The motion requested a default final judgment against Rodriguez based on his failure to appear at the pretrial conference and alleged that Rodriguez owed LVNV a principal balance of $1,911.55. The motion did not reference the settlement, the parties' agreement for Light to not attend the pretrial conference, or that coverage counsel

made a "mistake" in requesting entry of a default judgment at the pretrial conference.

After receiving the default-judgment filing, Light again contacted APLS. He asked why the judgment package had been submitted, why APLS had not moved to set aside the default as promised, and whether LVNV still intended to countersign the settlement agreement. APLS responded that the default final judgment "was NOT supposed to be submitted," that it would "get it withdrawn," and that LVNV would countersign the agreement. On September 12, 2023, APLS sent Light the fully executed settlement agreement. Later that day, however, the county court entered default final judgment against Rodriguez.

Light alleges that upon receiving the default final judgment he became "apoplectic," lost his appetite, and rushed through his young son's bedtime routine. Light alleges that he then spent "hours" preparing a motion to vacate the default final judgment on Rodriguez's behalf. Light filed that motion on September 21, 2023. As acknowledged by Light during oral argument, the county court later held an evidentiary hearing where it vacated the September 12 default final judgment and set aside the August 23 default.

Light then filed this federal action in his own name. His operative First Amended Complaint asserted claims against LVNV and APLS under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("FDCPA") and the Florida Consumer Collection Practices Act, Fla. Stat. § 559.72 ("FCCPA"). Light alleged that

LVNV and APLS made false, deceptive, and misleading representations in connection with their efforts to collect Rodriguez's debt; threatened or took actions they could not legally take; engaged in conduct whose natural consequence was to harass, oppress, or abuse him; and claimed or attempted to enforce a debt they knew was not legitimate.

LVNV and APLS moved to dismiss, arguing that Light lacked statutory standing under the FDCPA and FCCPA because the alleged debt-collection activity was directed at Rodriguez, not Light, and that the FCCPA claim was independently barred by Florida's litigation privilege. The district court granted the motion on statutory standing grounds, concluding that Light had not pleaded the kind of "injurious exposure" to LVNV and APLS's debt-collection conduct needed for a non-consumer to maintain a claim under the FDCPA.[2] Light timely appealed.[3]

## II.　STANDARD OF REVIEW

This Court is "under a duty to review its jurisdiction of an appeal at any point in the appellate process," *Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985) (per curiam), and we "review *de novo* questions of our jurisdiction." *United States v. Amodeo*, 916 F.3d 967, 970 (11th Cir. 2019). A plaintiff must support "each element"

---

[2] Because it found that Light lacked standing under the FDCPA, the district court dismissed the FCCPA claim on the same basis, declining to reach the question of whether Florida's litigation privilege barred the state law claim.

[3] Light represented himself, pro se, in both the district court proceedings and now before us on appeal.

of standing with "the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Thus, at the motion to dismiss stage, a plaintiff must "allege facts that, taken as true, 'plausibly' state that the elements of standing are met." *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1241 (11th Cir. 2022) (en banc) (quotation omitted). "If we lack jurisdiction, our only remaining function is to announce that we lack jurisdiction and dismiss the cause." *Nationwide Mut. Ins. Co. v. Barrow*, 29 F.4th 1299, 1301 (11th Cir. 2022).

### III.    ANALYSIS

Before any federal court may address whether a plaintiff can assert a claim, the court must first determine whether it has jurisdiction to hear the case at all. "The requirement that jurisdiction be established as a threshold matter spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (internal quotation marks omitted).

Federal courts are courts of limited jurisdiction. The Constitution limits our authority to actual "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. To ensure that we remain within our constitutional boundaries, plaintiffs must establish that they have standing to bring their case. *Lujan*, 504 U.S. at 560; *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en banc). Standing requires three elements: (1) "the plaintiff must

have suffered an injury in fact"; (2) "the injury has to be fairly traceable to the challenged action of the defendant"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (alteration adopted) (quotation omitted); *see Muransky*, 979 F.3d at 924.

Injuries "in fact" must be "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotations omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quotations omitted). "[G]eneral interest[s] common to all members of the public" are not particularized injuries. *Lujan*, 504 U.S. at 575 (quotation modified). And mere "expression[s] of a desire that the . . . [l]aw as written be obeyed" do not support an injury-in-fact. *Diamond v. Charles*, 476 U.S. 54, 66 (1986).

Whether a party has a cause of action under the FDCPA's "any person" language is separate from the inquiry of Article III standing. The question of whether a person has stated a cause of action to invoke a federal statute goes to the merits, rather than jurisdiction. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014). Statutory standing "properly asks whether the plaintiff 'falls within the class of plaintiffs whom Congress has authorized to sue' under the statute -- in other words, whether the plaintiff 'has a cause of action under the statute.'" *Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1313 (11th Cir. 2024) (Marcus, J., concurring) (quoting *Lexmark*, 572 U.S. at 128). And the "absence of a

valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the court's statutory or constitutional *power* to adjudicate the case." *Lexmark*, 572 U.S. at 128 n.4 (internal quotation marks omitted). Here, statutory standing and Article III standing were conflated in the district court's order. Article III standing, however, comes first and must be addressed before considering statutory standing. As such, we now turn to address Article III standing.

## A.

Article III limits federal judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2. "Perhaps the most important of the Article III doctrines grounded in the case-or-controversy requirement is that of standing." *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1273 (11th Cir. 2001). "[T]he standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (emphasis omitted) (quotation marks and citation omitted).

To constitute an injury in fact, a plaintiff's alleged harm must be both concrete and particularized, requirements the Supreme Court has consistently described as independent of each other. *Spokeo*, 578 U.S. at 340 (emphasis added in original) ("We have made it clear time and time again that an injury in fact must be both concrete *and* particularized."). An injury is concrete if it "actually exist[s]," and is real, not abstract. *Id.* at 340. An injury is

particularized if it "affect[s] the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Satisfying one does not satisfy the other. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

"At the pleading stage of a case, general factual allegations of injury can suffice [to show an injury]. But that [principle] is not a free pass—these general factual allegations must plausibly and clearly allege a concrete injury." *Muransky*, 979 F.3d at 924 (citation and quotation omitted). Consequently, Light must still plausibly allege that the violation he complains of aggrieves him with a concrete and particularized injury that satisfies our standing doctrine.

Intangible injuries can also qualify as concrete where the injuries have "a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 926. Where an element essential to the comparator tort is absent, the close-relationship test fails and there is no concrete injury. *Hunstein*, 48 F.4th at 1242–43.

**B.**

Light's claim rests substantially on the proposition that LVNV and APLS violated the FDCPA and that the violation itself—along with the costs he incurred in its aftermath—constitutes a cognizable injury. While we accept for purposes of this analysis that the violations occurred, that does not establish that Light suffered an injury in fact. The two inquiries are distinct.

We addressed a similar proposition in the FDCPA context sitting *en banc*. In *Hunstein*, a debt collector transmitted a consumer's personal debt information to a third-party mail vendor

hired to generate dunning letters. 48 F.4th at 1240. The consumer sued, arguing that the transmission to the vendor violated the FDCPA's prohibition on disclosing consumer information to unauthorized third parties. *Id.* The statutory violation, if it occurred, was real: the consumer's sensitive personal information had been shared with a company that had no legitimate role in the debt itself. But we held that the consumer lacked Article III standing because he had not alleged a concrete harm. *Id.* at 1245–46. Although the consumer's information was transmitted to a third party, because "no one read[] or perceive[d]" the information, the consumer did not suffer any real-world injury. *Id.* at 1247–48. A violation of the FDCPA, we explained, does not by itself supply the concrete harm Article III requires: "an injury in law is not an injury in fact." *Id.* at 1242 (quoting *TransUnion*, 594 U.S. at 427).

The Supreme Court has applied that principle in multiple statutory contexts. A plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 578 U.S. at 341. "Article III standing requires a concrete injury even in the context of a statutory violation." *TransUnion*, 594 U.S. at 426 (quoting *Spokeo*, 578 U.S. at 341); *accord Thole v. U.S. Bank N.A.*, 590 U.S. 538, 545 (2020). Thus, a technical statutory violation, without more, does not confer standing. *Muransky*, 979 F.3d at 930 ("The question, always, is whether an injury in fact accompanies a statutory violation.").

That principle finds additional grounding in the historical distinction between "private rights" and "public rights." Common-law courts historically required a plaintiff asserting a violation of a public right, one owed to the community at large rather than to the individual, to demonstrate concrete individual harm beyond the bare violation itself. *Spokeo*, 578 U.S. at 345 (Thomas, J., concurring). The FDCPA is a public-rights statute: it regulates debt collectors' conduct toward the public and authorizes suit to vindicate that public interest in fair collection practices. 15 U.S.C. §§ 1692a, 1692k. A plaintiff invoking it must show a concrete harm particular to himself, not merely a violation directed at someone with whom he has a professional relationship. Here, Light cannot make that showing because his injuries are entirely derivative of harm suffered by his client.

Indeed, the threshold problem with Light's claim is that every injury he alleges ultimately traces back to harm that belonged to Rodriguez. The default judgment entered in the state-court debt-collection proceeding was entered against Rodriguez. The time Light spent was spent remedying the adverse result Rodriguez received, and the distress Light experienced arose from his client's legal predicament.

For example, Light's First Amended Complaint alleges that LVNV and APLS used "false, deceptive and misleading representations and means in connection with their attempts *to collect the debt from Franklyn Rodriguez.*" (emphasis added). Light was not the collection target; he was the attorney representing that target. The

complaint confirms the derivative structure even more directly. Light alleges that Appellees knew "the entry of the final judgment had a high likelihood of causing injury or damage *to Franklyn Rodriguez* and to his attorney GREGORY ANDREW LIGHT." (emphasis added). Rodriguez is primary; Light is secondary and derivative. Light's own pleading thus confirms the derivative nature of his injuries.

The Supreme Court has recognized that when a plaintiff's asserted injury arises from conduct directed at someone else, "much more is needed" to establish standing. *Lujan*, 504 U.S. at 562. Downstream consequences of another party's harm do not automatically become the plaintiff's own injury in fact. *Id.*

Our most recent decision in this area confirms that Light's time-and-effort theory does not establish Article III standing. In *Nelson v. Experian Information Solutions, Inc.*, 144 F.4th 1350 (11th Cir. 2025), the plaintiff discovered several inaccuracies in the personal information section of her own credit file. *Id.* at 1352–53. She then spent time and money sending certified letters to Experian to correct those errors. *Id.* at 1353. But the errors had not been published to any third party, had not lowered her credit score, had not caused a denial of credit, and had not otherwise affected her in any concrete way. *Id.* at 1352–54. So, we held that she lacked Article III standing. *Id.* at 1355. As we explained, a plaintiff "cannot manufacture standing by spending time and money to rectify an otherwise harmless statutory violation." *Id.*

The hours Light spent preparing the motion to vacate fall within the category *Nelson* forecloses. Nelson, at least, spent time and money trying to correct information in her *own* credit file. Light spent time preparing a motion to vacate a judgment entered against *someone else*. The default final judgment (1) imposed liability on Rodriguez, (2) required Rodriguez to complete a fact-information sheet, and (3) exposed Rodriguez to post-judgment collection. It did none of those things to Light. Light's remedial work was responsive to Rodriguez's injury, not Light's. And, unlike the plaintiff in *Nelson*, the allegations in the First Amended Complaint give rise to the plausible conclusion that Light's own actions contributed to the predicament his client found himself in. If Nelson could not establish Article III standing by spending her own time and money to correct errors in her own credit file—errors she did not contribute to—that had not otherwise affected her, Light cannot establish standing by spending attorney time correcting a judgment that legally affected only his client and which he at least plausibly played a part in. *Nelson*, 144 F.4th at 1355; *see also Muransky*, 979 F.3d at 931 (explaining that "wasted time and effort necessarily rises or falls" with whether the underlying violation caused a concrete harm to the plaintiff) (quotation omitted).

Of all the harms Light alleges, reputational harm is his strongest, and we address it separately. The Supreme Court has recognized that reputational injury can constitute a concrete harm for purposes of Article III standing. *TransUnion*, 594 U.S. at 432. The defamation analogue—harm to the plaintiff's reputation through the communication of false and damaging information to

third parties who perceive it—is well established as a basis for standing when its elements are present. *Id.*; *Hunstein*, 48 F.4th at 1242–43. We therefore take Light's reputational harm claim seriously. Even so, it fails on its own terms.

The reputational harm Light describes never left the room. When pressed at oral argument to identify what reputational harm he actually suffered, Light described an uncomfortable conversation that he "was forced to have" with Rodriguez about why a default judgment had been entered against him. That is the crux of the reputational injury Light points to: an adverse development in the representation, communicated between attorney and client.

That is not a cognizable reputational injury for two independent reasons. First, and most fundamentally, Appellees' alleged misrepresentations were not about Light. They concerned Rodriguez's debt and Rodriguez's obligations in the underlying collection proceeding. For the defamation analogue to supply concrete injury, a false statement about the plaintiff must be communicated to a third party who perceives it. *TransUnion*, 594 U.S. at 432. But nothing false or damaging was said about Light at all, to anyone. Even if Appellees' representations had been communicated to every third party imaginable, they would not have constituted reputational harm to Light because they were not about him.

Second, even setting aside the absence of any statement about Light, no information of any kind about Light reached any third party in a manner capable of harming his reputation. *Hunstein*

establishes that even actual transmission of sensitive consumer information to a third party is not enough to show reputational harm unless someone read and perceived it. 48 F.4th at 1240 ("Without publicity, a disclosure cannot possibly cause the sort of reputational harm remediated at the common law."). Light's situation is even more attenuated. No information about his professional conduct, competence, or character was transmitted to anyone. The conversation he identifies with Rodriguez occurred entirely within the attorney-client relationship. *See id.* at 1244 ("[M]isleading information—like false information—can lead to unfair reputational harm if publicized, no reputational harm at all occurs when either sort of information is kept private.").

Light does not allege, for example, that he was sanctioned by the court. He does not allege that he lost clients, lost revenue, or suffered any measurable harm to his standing in the legal community.[4] The word "reputation" does appear in his complaint, but there are no details about any third party who received damaging or false information about Light, nor any professional consequence. Stripped of the conclusory label, what Light calls reputational harm is indistinguishable from the professional embarrassment that accompanies any representation that does not go

---

[4] True, Light's law firm has a financial interest in this litigation through its potential entitlement to attorney's fees under the FDCPA. But that interest cannot supply the concrete stake that Light himself lacks. An interest in attorney's fees is insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim. *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990); *accord Thole*, 590 U.S. at 541–42.

smoothly.  That is not a concrete injury for purposes of Article III standing.  *Spokeo*, 578 U.S. at 340.

Because we conclude that Light did not state a concrete injury sufficient to establish standing, we need not address whether the injury is also particularized.  *See Lujan*, 504 U.S. at 560 (holding that an "injury in fact" must be both concrete *and* particularized).

## IV.    CONCLUSION

For the reasons stated, Light has not alleged a concrete injury in fact sufficient to establish Article III standing.  We thus dismiss this appeal for lack of jurisdiction.

**DISMISSED.**